```
 1              UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON
 2                     IN SEATTLE

 3    ----------------------------------------------------------------

 4    DIANNE L. KELLEY, et al.,    )
                                   )
 5              Plaintiffs,        )  No. C07-475MJP
                                   )
 6       v.                        )
                                   )
 7    MICROSOFT CORPORATION, a     )
      Washington corporation,      )
 8                                 )
                Defendant.         )
 9                                 )

10    ----------------------------------------------------------------

11

                 MOTION FOR SUMMARY JUDGMENT
12

13    ----------------------------------------------------------------

14

              BEFORE THE HONORABLE MARSHA J. PECHMAN
15

16

                      January 22, 2009
17

18    APPEARANCES:

19    For the Plaintiff:       Jeff Tilden
                               Mark Wilner
20                             Jeff Thomas
                               Attorneys at Law
21
      For the Defendant:       Stephen Rummage
22                             Charles Casper
                               Charles Wright
23                             Attorneys at Law

24

25
```

1          THE CLERK:  This is the matter of Dianne Kelley versus

2    Microsoft Corporation, cause number C07-475.  Counsel, for the

3    record, please make an appearance.

4          MR. TILDEN:  Jeff Tilden, your Honor, with the

5    plaintiffs, with Jeff Thomas, Mark Wilner and Ian Birk.

6          MR. RUMMAGE:  Steve Rummage, your Honor, on behalf of

7    the defendant Microsoft Corporation.

8          MR. CASPER:  Charles Casper on behalf of Microsoft.

9          MR. WRIGHT:  Charles Wright on behalf of Microsoft, your

10   Honor.

11         THE COURT:  Well, gentlemen, it looks like you brought

12   fan clubs.  You should have received a series of questions that I

13   posed to you that I would ask that you answer sometime during the

14   course of your arguments.  I have allotted you 30 minutes per

15   side.  We have two motions to deal with today, although I am a

16   little mystified as to why it is two.  It seems to me that the

17   issues are the same, and I kept reading the same things over and

18   over.  Let's focus today --  I don't know if you want to take

19   them separately or not.  I really view them as the mirror image

20   of the same issue.  If you don't, please feel free to divide your

21   time as you would like to do so.

22      Mr. Rummage, it is your motions.

23         MR. RUMMAGE:  Thank you, your Honor.  And actually we

24   see it very much as your Honor does.  We do see it essentially as

25   two sides of the same coin.  There are some nuances that are

1    different with respect to the summary judgment motion, which we

2    will get into particularly when we get to the last issue.

3        Both of the motions grow out of your Honor's class

4    certification ruling back in February of last year.  At that

5    time, as your Honor knows, the Court held that the plaintiffs

6    could not establish causation in a deception based claim on a

7    class wide basis, and denied certification on that theory.  But

8    instead allowed the plaintiffs to pursue what your Honor

9    characterized as another possible theory.  And that was the price

10   inflation theory.

11       The Court acknowledged that most courts, perhaps even all

12   other courts up to that time, had rejected that theory, but your

13   Honor said, I am not persuaded that the Washington State Supreme

14   Court would reject it, and so I will allow you to further develop

15   the theory.

16       The Court then narrowed and limited, in the Court's words,

17   the issues on the CPA price inflation theory to two.  One was

18   whether the Windows Vista Home Base Edition is fairly called

19   Windows Vista; and the second issue was whether the Windows Vista

20   Capable Marketing Program artificially inflated demand and prices

21   on one subset of PCs, that is Windows Vista Capable but not

22   Premium ready.

23       My argument this morning, your Honor, is going to be directed

24   at both of those issues.  I am going to spend most of my time, if

25   your Honor will allow, talking about the demand and price

1   inflation issue.  And I really have kind of two sub points on

2   that.

3      We think the Court should decertify the class and grant

4   summary judgment, first of all, because the plaintiffs have not

5   produced that quantum of proof that they need to produce in order

6   to establish that price inflation theory; and, second, because

7   the plaintiffs essentially admit that they cannot show causation

8   of the damages they seek on a class basis.  And Washington law

9   says they have to show causation of damages, not just injury.

10      And finally, your Honor, after talking about that I plan to

11  spend my time talking about why Windows Vista Home Base is fairly

12  called Windows Vista.  And I do plan to answer all four of your

13  Honor's questions, which I think actually have about ten

14  questions embedded in them along the way.

15      First let me turn to that first point, and that is the

16  quantum of proof that the plaintiffs have to produce in

17  connection with this price inflation theory.  And let me begin by

18  observing that this price inflation theory comes from, derives

19  from a principle that has been recognized in securities cases for

20  roughly 30 years, and that is the fraud on the market theory.

21      The theory there is in an efficient market, that is a market

22  that can absorb public information and reflect it, process it in

23  the price of a security, in that instance in an efficient market

24  if there is a lawsuit brought about a misstatement you don't need

25  to show empirically reliance or causation because economics show

1    in those efficient markets that information is processed and

2    immediately reflected in price.  And so there is a price

3    inflation that people can recover for in a securities case if

4    they can show an efficient market.  And there is a lot of

5    litigation about what is an efficient market and what isn't.  And

6    that is often the threshold question in those kinds of cases.

7        Now, we have to the an expert declaration here from Dr. Paul

8    Gompers from Harvard.  And Dr. Gompers has testified in this case

9    the market that is at issue here is not an efficient market.  And

10   Dr. Leffler agrees.  What is the significance of that?  The

11   significance is that we cannot presume price inflation.  As

12   Dr. Gompers explains, in that situation price inflation has to be

13   empirically proven.  That is kind of the fundamental predicate we

14   begin with here.

15       It is interesting that in the three or four paragraphs that

16   Dr. Leffler, plaintiffs expert, devotes to responded to

17   Dr. Gompers he does not take issue with that notion of empirical

18   proof.

19       So that brings us to your Honor's first question, which is,

20   what evidence is necessary to establish a price inflation theory

21   of causation?  Well, your Honor, there is case law on this.  And

22   we think it is pretty clear that the case law establishes that

23   what is not enough is intuition, what is not enough is basic

24   economic principles.  Recent cases have so held.

25       What instead a plaintiff has to show is that empirically that

1    prices have been inflated, and inflated not just as to particular

2    individuals or segments but across the class.  Because if you

3    can't show inflation across the class it is not a class action.

4    And, finally, after you show the inflation you have to show that

5    the alleged wrongdoing accounts for the inflation.  In order to

6    get a class certified you have to show that you can, through an

7    established methodology, factor out all of the variables that

8    might account for that price inflation other than the alleged

9    wrongdoing.

10        Now, we are not pulling that out of thin air.  As your Honor

11    can see from the briefs there are recent case from the First,

12    Second and Sixth Circuits standing for this proposition.  A

13    recent case from the Northern District of California, in which

14    Dr. Leffler was the expert, standing for the same proposition.

15    In three of those cases classes were either -- class

16    certification was either reversed, in the First and Second

17    Circuit, and in the Northern District of California the class was

18    decertified.  In the Sixth Circuit case summary judgment was

19    granted against the class.

20        Now, the two cases that came down after your Honor's class

21    certification ruling are the In Re New Motor Vehicles case and

22    the McLaughlin case.  In the In Re New Motor Vehicles case the

23    allegation there that the plaintiffs made was that the car

24    companies had restricted imports of lower priced Canadian cars,

25    and by restricting the imports of lower priced Canadian cars they

1    were able to maintain prices on US cars.  Not dissimilar to what

2    the allegations are here.

3        There was an expert in that case who did a quantitative

4    regression analysis to show the impact on price of the alleged

5    restriction of the imports.  Still that court said -- the First

6    Circuit said, the expert couldn't, hadn't done enough to support

7    class certification because he couldn't separate out lawful from

8    unlawful effects.

9        What it said was this:  "Plaintiffs seem to rely on an

10   inference that any upward pressure on national pricing would

11   necessarily raise the prices actually paid by individual

12   consumers.  There is intuitive appeal to this theory but

13   intuitive appeal is not enough."  And so it reversed.

14       And when it reversed it remanded and said, you can go back

15   now and see if the expert really can do it, really can do an

16   econometric study that separates out these variables, and if he

17   can you can take another run at class certification.  That case

18   is good, your Honor, because it separates out what is good enough

19   and what is not.

20       What the First Circuit said is, the theory isn't good enough,

21   we need actuality; we need to see, especially in a novel theory

22   like this, that you really can do what you say you can do.

23       The McLaughlin case out of the Second Circuit alleged that

24   misstatements inflated the price of light cigarettes, that the

25   cigarette companies overstated the benefits of light cigarettes.

1    Price inflation as a result.

2        Plaintiffs had experts.  The experts did an econometric

3    analysis.  The experts did a consumer survey.  The Second Circuit

4    said, not good enough, because these plans by the experts don't

5    separate out the variables that could account for the pricing of

6    light cigarettes.  Certification reversed.  Not given another

7    shot to do it.

8        In the JBDL versus Wyeth case, your Honor, involved price

9    inflation with respect to a drug.  Dr. Leffler appeared in that

10   case and said, basic economic principles show that when Wyeth

11   expanded its market share it used that to inflate prices.  In

12   that case, your Honor, there even was accepted evidence of price

13   inflation, because they knew what Wyeth had done with the price

14   of the drug.  The court said, not good enough; too many

15   alternative explanations for what might account for the price and

16   you can't proceed to trial without those explanations being

17   factored out, and it can't be done.

18       And finally, in the Methionine case, your Honor, Dr. Leffler

19   gave Judge Breyer down in the Northern District of California a

20   simple regression analysis.  And Judge Breyer said, not good

21   enough; I need a multiple regression analysis that factors out

22   all of the factors.  Why?  Because it is a complex market with

23   lots of sellers and lots of products.

24       So those are the cases, your Honor.  And plaintiffs literally

25   respond with nothing.  They respond with no price inflation cases

where a plaintiff's expert is allowed to take a case either

through certification or through the summary judgment process

with the kind of ipse dixit that Dr. Leffler provides to the

Court.

So that brings me to the Court's second question, which is,

why should the Court pay attention to these cases.  I am not sure

the Court phrased it that way but that was the second question

that was embedded in that question number one.  Your Honor, we

think the reason is clear.  If your Honor recalls back to when we

were arguing a year ago, at that time we explained to the Court

that court after court actually had rejected the price inflation

theory.  So your Honor is treading on new ground.  Because your

Honor is treading on new ground we don't have any choice but to

look at analogous areas of the law.

Furthermore, leaving aside what we conceptually think makes

sense, the Washington Consumer Protection Act in RCW 19.86.920

says, "in construing the act courts", and I quote, "should be

guided by final decisions of the federal courts interpreting the

various federal statutes dealing with the same or similar

matters."

Well, the cases that I have just cited to your Honor are all

either antitrust or RICO case.  The antitrust statutes, as your

Honor knows, were the initial foundation for the Washington

Consumer Protection Act.  The RICO statute was based on the

federal antitrust statute.  All of those statutes require that to

1    prosecute a civil cause of action a plaintiff has to show injury

2    to business or property, just like our CPA.  And all of them

3    allow recovery of actual damages, just like our CPA.  So we are

4    dealing with statutes that have the same general framework and

5    the purpose of protecting the integrity of competition in the

6    marketplace and they reach exactly the conclusion that we

7    advocate here.

8        And finally, your Honor, I would say the other reason to

9    follow them, perhaps the best, is they make sense.  And the

10   reason they make sense is this:  When you are pursuing a price

11   inflation claim it is a quantitative claim.  It is a claim that

12   there is increment in a price that reflects an economic addition

13   to the price as a result of misconduct.

14       Because we are talking about prices we are talking about a

15   data rich environment.  We know what things sell for.  We can get

16   price lists.  Especially now.  We can get on the internet and see

17   what things sold for in the past.  And so in that data rich

18   environment courts properly expect, especially in a case seeking

19   literally billions of dollars, trebling, courts properly expect

20   that experts are going to be able to mine that data and come up

21   with answers.

22       Your Honor's next question embedded in that first one is:  If

23   the plaintiffs are relying on anecdotal evidence of price

24   inflation do they have to isolate out the variables?  Well, let

25   me first question the premise of that, your Honor.  Because in

1    fact there is no anecdotal evidence at all of price inflation

2    here.

3        Let me explain what I mean by that.  Dr. Leffler has a very

4    specific theory, and it is set out in tab 4 of what we handed up.

5    His theory that there are kind of three buckets of PCs in the

6    marketplace.  There is the non Windows Vista Capable bucket.

7    Those are the really low end PCs.  There is the Windows Vista

8    Capable but not Premium ready PCs, which is the PCs that the

9    class bought.  And then the Premium ready PCs.  So there are

10   these three buckets.  His theory is that there was increased

11   demand and increased prices for this middle bucket, that is the

12   class's PCs, but that there was decreased demand for the really

13   good PCs, the Premium ready PCs, and therefore decreased prices

14   and decreased prices for the low end, non Windows Vista Capable

15   PCs.

16       Now, if we were expecting anecdotal evidence to support that

17   theory we would expect to see some computer that the plaintiffs

18   could hold up and say, this computer reflects Dr. Leffler's

19   theory.  It is a computer where either prices went up or prices

20   were maintained and they fell into this category, or there were

21   Premium ready PCs and we can show prices fell.  But there is no

22   anecdotal evidence of that at all.

23       Let's hypothesize that there were anecdotal evidence.  Let's

24   hypothesize that the plaintiffs could show that some PCs or some

25   categories of PCs actually did have a price increase.  Would we

1  still have to worry about variables?  I think the answer is, your

2  Honor, we would especially have to worry about variables.  And

3  the reason is that this case is different from any of the cases

4  that we just described in a way that makes the proof of price

5  inflation even more difficult than in McLaughlin, Wyeth or the

6  New Motor Vehicles.  Why?  Because in those allegations the

7  defendant inflated prices.

8      The allegation in this case is not that Microsoft inflated

9  prices.  The allegation is that Microsoft did something and that

10 other participants in the market, that Microsoft bears no

11 responsibility for, in turn increased prices.

12     There are dozens of PC OEMs out on the marketplace, your

13 Honor.  All of them have their own pricing strategies.  All of

14 them have their own model lineups.  All of them have their own

15 desires as to how they want to mix their sales, how much Premium

16 ready they want to sell, how much non Vista Capable and how much

17 Vista Capable they want to sell.  All of them.

18     There are retailers out there.  Thousands of retailers.  Some

19 are specialty high end catering to elites, who really want the

20 highest end PCs.  Some are mass marketers like Walmart.  They all

21 have different pricing strategies.  There are different models of

22 PCs.  There is a long period of time that we have involved in

23 this case.

24     For example, your Honor, Ms. Kelley says that she started

25 shopping for her PC a year before she bought it, before the

Windows Vista Capable period began, bought it in November of 2006

when it was at the lowest price she ever saw, $200 off the marked

price plus a free printer.  Do we know whether there was an

increment of price inflation in that PC that had been on the

market for more than a year, and it was marked down to that

extent in November of 2006?  So that is a variable we would need

to account for.

    And I would also add, your Honor, when I was talking about

retailers, the plaintiffs themselves presented evidence, and it

is at Bates number 40427, that suggests that Walmart was taking

delivery of Windows Vista Capable PCs but not allowing them to be

labeled.  And if that is the case, your Honor, they don't even

have a class that includes those people.  And we will never know.

We will never know because we don't know which PCs bore labels

and which PCs did not.

    And so the bottom line, your Honor, is that there is a

constellation of variables that one would have to take into

account just to satisfy yourself that there is price inflation,

let alone the question of what caused the price inflation.

    So what does Dr. Leffler do?  What does the plaintiffs'

expert do to segregate out any of these variables?  The short

answer, your Honor, is nothing.  And I mean literally nothing.

He did not do a pricing analysis.

        THE COURT:  Mr. Rummage, you have to slow down.  I can't

get a good record on you when you talk that fast.

1          MR. RUMMAGE:  My enthusiasm gets me carried away.

2          THE COURT:  I am feeling the enthusiasm.

3          MR. RUMMAGE:  That's why your Honor has to interrupt me

4    every now and then.

5       The short answer, your Honor, is Dr. Leffler did nothing

6    whatsoever.  He didn't do a pricing analysis.  He didn't do the

7    rudimentary pricing analysis that one might expect.  And that is

8    simply to look at what a PC was selling for before the Windows

9    Vista Capable period and what it was selling for after, and

10   perhaps comparing it to one of the PCs in one of the other

11   categories.  Your Honor will remember he has the three buckets.

12   These prices go down, the prices of the PCs in the middle go up.

13   So we ought to see changes in the differentials between the PCs.

14   He didn't even try.

15      Did he do a regression analysis?  Well, we know that is what

16   Judge Breyer expected in Methionine.  We know that is what the

17   experts did in McLaughlin and New Motor Vehicles.  Dr. Leffler

18   didn't try.  He says, I can't do it.  If you look at tabs 1, 2

19   and 5 we can see the examples in his testimony acknowledging that

20   he didn't do it.

21      Did he do a consumer survey, which was done in the McLaughlin

22   case, to see whether people really carried about these logos?  He

23   didn't do a consumer survey.  Did he look at different OEMs and

24   how the practices varied from OEM to OEM?  He didn't.  Did he

25   look at any the retailers?  He didn't.  Did he look at how prices

1   vary over time?  He didn't.  Did the plaintiffs depose any of

2   these people?  They didn't.

3       As we sit here today we have literally no insight into the

4   people who are accused of raising prices did.  We have nothing.

5   We have nothing to suggest what the OEMs and what the retailers

6   did.  And that we believe, your Honor, is a shortcoming under the

7   prevailing case law means that your Honor should decertify the

8   class and grant summary judgment.

9       Now, I might add, your Honor, I don't presume what any of

10  this would show.  I don't know.  And it may even be, your Honor,

11  that the plaintiffs did some of these studies and chose not to

12  introduce the expert who did them.  We will never know.

13      What we do know is that what they have come to the Court with

14  is intuition and in general economic principles that courts

15  repeatedly have rejected as the foundation for this kind of

16  claim.

17      With that, your Honor, I want to turn to the second point.

18  That point will answer your Honor's second question.  That has to

19  do with the inability of the plaintiffs to show causation of

20  damages at all.

21      Now, before I get into that I think I need to spell out just

22  for my own foundation what the plaintiffs damages theory is.

23  They claim that Dr. Leffler's testimony establishes causation and

24  injury.  And the injury is every member of the class, every one,

25  no matter whether they bought, where they bought, what they

1    bought had some increment, an unknown amount, of price inflation.

2    And that really is his intuitive sense based on reading these

3    documents.

4         The reality is that Dr. Leffler also says, I would be

5    speculating if I tried to tell you how much.  And that tells you

6    we can't go to a jury with that theory because juries can't award

7    damages that are based on speculation.  And he acknowledges it

8    would be.

9         So the plaintiffs do what I will call a bait and switch.

10   They say, we are going to prove injury and causation using this

11   harm, price inflation, and when we get to trial we want to prove

12   our damages using a different harm, the expectation damages.

13        Now, as a matter of law, your Honor, they can't do that.

14   They chide us for not relying on Washington cases but the reality

15   is Washington law settles this issue.  When one looks at

16   Hangman's Ridge, the Supreme Court's opinion in Hangman's Ridge

17   sets out the five elements of the Consumer Protection Act

18   violation.  One of those elements is causation.

19        When the Supreme Court starts applying the five elements to

20   the facts in Hangman's Ridge here is what it says about

21   causation:  "Finally the causation element is missing.  Even

22   assuming the injury complained of had been established, there is

23   no plausible link between the actions of the closing agent, the

24   defendant and the alleged damages."

25        The same here, your Honor, even assuming injury there is no

1    causation that plaintiffs can show of the expectation damages

2    that they seek to recover in the form of however much it cost to

3    upgrade a PC from a non Premium ready PC to a Premium ready PC.

4        The reason we know that there is no class wide causation

5    proof on that kind of expectation damage is that your Honor

6    already held that a year ago.  That is precisely what was brought

7    before the Court in connection with the class certification

8    motion.  And your Honor said, because of the varying influences

9    potentially on the class one couldn't show causation on a class

10   wide basis on a deception type claim which would have as its end

11   game the recovery of expectation damages.

12       So the bottom line is, we have already been past the point

13   where we can talk about recovering expectation damages on a class

14   basis.  Your Honor has ruled, it is the law of the case and

15   plaintiffs have not questioned it.

16       That brings us to your Honor's next question, which is,

17   assuming that we have it right on the damages, can the Court cure

18   this by bifurcating this case into liability and damages phases.

19   I think the short answer to that, your Honor, is no.  And the

20   reason the answer is no goes back to the Ninth Circuit's opinion

21   in the In Re Dalkon Shield case, back in 1982, still the leading

22   case on this issue.  In that case what the Court said, before you

23   do a certification of a chunk of a case as a class action you

24   have to be able to satisfy yourself that certifying that chunk is

25   going to advance the ball towards a complete class recovery.

1    In this case, your Honor, you cannot possibly make that

2    finding because, as we said a moment ago, there is a complete

3    disconnect between the liability case they want to prove and the

4    damages they want to recover.  They want to try a liability case

5    on the question of price inflation but they want to recover

6    damages on the basis of expectation damages.  And so going to

7    trial on this price inflation theory is going to shed no light on

8    whether they can recover an expectation damages recovery, which

9    would require millions of individual trials to determine who

10    expected what and why they expected it.

11    And indeed, your Honor, when you look at the cases that have

12    addressed this very issue in this very context we are back to

13    McLaughlin and In Re New Canadian Motor Vehicles.  Because in

14    both of those cases, after the circuit court reversed

15    certification by the trial court because of the inadequacy of the

16    plaintiff's proof, in both of those cases the plaintiff said,

17    well, please let us at least go to trial on liability issues.

18    And in each case the circuit court said no.

19    The First Circuit in particular noted the fact that the

20    deficiency in the expert's proof, just like the deficiency in the

21    expert's proof here, went to the question of causation.  And

22    without causation there is a liability problem.  So in other

23    words even if we bifurcate this into liability and damages there

24    is still a fundamental, non class issue as to liability because

25    the expert's inability to go to court and present a method of

1    determining class wide damages or injury, as the plaintiffs want

2    to phrase it, factoring out all of the individual factors that

3    could have affected prices.  Prices set not by Microsoft, not by

4    Microsoft, but by dozens of OEMs, thousands of retailers who are

5    not in this courtroom today.

6         THE COURT:  Mr. Rummage, is there conceivably another

7    theory out there?  If we are drawing from other arenas I have

8    only seen this in patent cases.  It would attach to the unjust

9    enrichment that the value to the class is what Microsoft valued

10   its advertising on.  In other words, they stuck these logos on

11   these machines or had the OEMs do so.  If that was a deceptive

12   act then the value of the advertising would set the floor for

13   what it was worth.

14        MR. RUMMAGE:  Here is the problem with that, your Honor.

15   And it actually relates to an issue that I meant to talk about a

16   little bit and didn't.  One of the main problems with that, your

17   Honor, is that when you say "the value of the advertising" is

18   that we have to remind ourselves that what we are talking about

19   here is not the Windows Vista Capable program generally, and we

20   are not talking about advertising generally, we are talking about

21   the plaintiffs claim with respect to a narrow subset of the

22   Windows Vista Capable program, that is the non Premium ready PCs.

23   And I know of no advertising of non Premium ready PCs, none, done

24   by Microsoft.

25        When one looks at whatever marketing materials were

1   presented, whatever marketing programs were done, they were

2   marketing programs with respect to a program that plaintiffs

3   acknowledge was perfectly appropriate as to Premium ready PCs.

4   There is no challenge as to Premium ready PCs.

5       When one looks at the marketing that was done on that, your

6   Honor, one finds, contrary to what Dr. Leffler says, all of the

7   efforts were being made to market not these window Vista Capable

8   but not Premium ready PCs, instead they were being made to market

9   the Premium ready PCs that are not in issue in this litigation,

10  as Mr. Totton's declaration shows.

11      I think it is impractical approach, number one.  It is an

12  impractical approach, number two, that plaintiffs have never

13  suggested, never suggested, to the Court.  And, number three,

14  your Honor, it seems to me that it is going to be fraught with

15  the same sort of class issues in terms of determining individual

16  advertising as to individual consumers.

17      What I mean by that is this:  I didn't articulate that very

18  well.  Let's go back to the Walmart analogy a moment ago.  This

19  speaks to your Honor's point that Microsoft had people put

20  stickers on PCs.  Microsoft made it possible for people to put

21  stickers on PCs.  But as the very evidence that plaintiffs' cite

22  shows, retailers could exercise their power to say, we don't want

23  PCs with stickers.  Plaintiffs' evidence says that Walmart did

24  that.  OEMs could exercise their authority to say, we don't want

25  to put stickers on this PC because our pricing strategy and our

1    marketing strategy is to drive demand to our Premium ready PCs

2    where we have a higher margin.  There is no evidence on that.

3        There is still going to be that same issue if your Honor goes

4    to the theory that your Honor just espoused.  You are still going

5    to have to figure out where did those advertising dollars go.

6    Did they go with respect to PCs that actually were advertised as

7    Windows Vista Capable but not Premium ready or not?  The answer

8    is, I think, it will vary from entity to entity, retailer to

9    retailer, OEM to OEM, which is perhaps why the plaintiffs have

10   never advocated the theory.

11        THE COURT:  Mr. Rummage, what you are telling me is that

12   if I assume that Microsoft for purposes of argument has done

13   something deceptive by telling me that Vista Capable means that

14   it will run everything, are you telling me the only way to get at

15   this is one at a time, each individual plaintiff telling their

16   personal story and getting their $400 back?

17        MR. RUMMAGE:  I am going to start with the premise, your

18   Honor, I don't think we did anything wrong.  And that actually is

19   the next problem I was going to argue.  I understand I have to

20   assume that.  I can't let that assumption pass without comment.

21        If we assume that I think that is the outcome, your Honor.

22   And I understand your Honor's hesitation with that.  But the

23   Second Circuit speaks directly to this issue, because the Second

24   Circuit is dealing with the situation where the allegation is

25   that the tobacco companies misstated the, quote, health benefits,

1    close quote, of light cigarettes.  And the Second Circuit says,

2    you know, that is a bad thing.  And what we are talking about

3    here is a bad social problem.  We agree something has to be done

4    about it.  But you know what?  We are not necessarily the forum

5    for remedying every perceived social wrong.  We have to follow

6    the standards.  And the standards, your Honor, lead ineluctably

7    to that conclusion.

8        I don't think, your Honor -- I don't think your Honor should

9    feel uncomfortable with that.  And here is why:  Because we know

10   from the statistical evidence that has been presented to the

11   Court that we are talking about a tiny, tiny fraction of people

12   who arguably could have been affected, even if we were talking

13   about actual deception, which we do not believe occurred.  And so

14   to say that we have on the one hand the choice of pursuing a

15   defective class action that would involve millions and millions

16   of people who, for all the evidence that is before the Court,

17   never did have any expectation of getting anything other than

18   what they got.  Remember what that PC logo said.  It said,

19   "designed for Windows XP, Windows Vista Capable."  And we know

20   that most people buy those PCs with the expectation --  They are

21   like me.  I am never going to change out the operating system on

22   my PC.  I am going to dance with the OS that brung me.  I am

23   going to be there with the XP operating system.  Experience shows

24   that is what happens.

25       So if our choice is do we pursue a defective class action

with millions of people, even if plaintiffs are right, don't care, or do we say that those people who really do care will have to pursue their individual remedies.  I think, your Honor, that the choice is clear.  And it is clear I think not only as a matter of legal precedent but as a matter of judicial policy in terms of when the Court intervenes in disputes.

We are not supposed to through the class action device improve the situation of either party.  And plainly, your Honor, if we allow plaintiff's to skate by with the kind of evidence they presented through Dr. Leffler we would improve their position.

Nothing illustrates that more clearly than Ms. Kelley's situation.  Because remember Ms. Kelley testified, I didn't know what Windows Vista was; I didn't buy it with the expectation of getting Windows Vista; I didn't know there was a Windows Vista Capable program; I didn't know there was a sticker on my PC.  And yet she comes into court and says to the Court, I've got an expert who says there was some increment of my PC price that was attributable to price inflation.  It might be a nickel, it might be a buck, it might be ten bucks, but he says there is some increment.  And so what I want the Court to do is I want Microsoft to buy me a new PC.

Their allegation is that though she paid $499 for a PC she had been shopping for for a year, we have to pay her $575 back, more than she paid for the PC, so that she can buy yet another PC

1    with Windows Vista on it, even know she had the option of buying

2    Premium ready PCs back then and chose not to do it.

3        Now in that scenario, your Honor, I submit that the

4    appropriate remedy is for Ms. Kelley, if she believes she has an

5    individual cause of action, to pursue it, and not to sweep her

6    into a class with that sort of, again, defective economic proof.

7        Now, if I may --  I don't know if I have already overstayed

8    my welcome.  I have two more questions of your Honor to answer,

9    which I am happy to do, or I am happy to sit down, as your Honor

10   pleases.

11           THE COURT:  Quickly, Mr. Rummage.

12           MR. RUMMAGE:  Okay.  The two more questions that your

13   Honor asked were these:  First, does the development of Windows

14   Vista to include Windows Vista Home Basic foreclose finding that

15   Windows Vista Capable program had the capacity to deceive?  And I

16   think the shortest answer to that is yes.

17       The reason for the shortest answer is this:  If Windows Vista

18   Home Basic was Windows Vista then it was absolutely,

19   categorically true to say that a PC that could run Windows Vista

20   Home Basic could run Windows Vista.

21       Frankly, I thought that was what the Court was getting at

22   when the Court said there are two questions, and one of them is,

23   is Windows Vista Home Basic fairly called Windows Vista.  I think

24   we have shown, as a technical matter, and plaintiffs concede as a

25   technical matter, it is part of the Windows Vista family.

1    Mr. Allchin, their expert, says it is common in the software

2    industry to develop a robust, fully featured operating system or

3    piece of software and then disable certain features to

4    differentiate between SKUs or editions and to sell them at

5    different price lines.

6        All that happened here was Microsoft chose to differentiate

7    between Windows Vista Home Basic and Windows Vista Home Premium

8    by the Aero user interface.  It had ever right to do that and it

9    did.

10        THE COURT:  I think you may have misunderstood me,

11    Mr. Rummage, in the way we set it out a year ago.  I have never

12    thought that Microsoft didn't have the power, authority, right to

13    build as many different kinds of programs as they wish.  The

14    issue was the labeling, not what they can do.

15        MR. RUMMAGE:  Fair enough.  That goes to your Honor's

16    next question, which was, isn't the issue whether the sticker is

17    misleading.  And I think the answer to that, your Honor, is that

18    the plaintiffs have never claimed, never claimed, that the

19    sticker standing on its own is misleading.  The question is, what

20    does it mean in the context -- what does it mean in the context

21    of what was said about what Windows Vista meant and whether

22    Windows Vista Aero was included in Windows Vista Premium.

23        THE COURT:  I happen to have a little prior knowledge

24    about how it is that Microsoft picked Vista as a name.  I have

25    that lawsuit too.  The whole idea of seeing into the future, the

 1    screens that fade away.  You spent -- I can't remember exactly

 2    how much but lots of money to develop the name.  You were trying

 3    to market something new and yet what you give the people with the

 4    Basic is the same old same old.

 5            MR. RUMMAGE:  Your Honor, with all due respect what your

 6    Honor just said there is not a shred of evidence to support that

 7    in the record.  It is not the same old, same old.  It is

 8    different computer code, it has completely different

 9    characteristics.  That is not trivial.  That is how operating

10    systems are built, is with computer code.

11            THE COURT:  That is not the part that is deceptive.

12            MR. RUMMAGE:  I was going to say, what matters is --

13    because what matters, in terms of determining what deceptive is,

14    is what do you tell people.  Fair enough.  It seems to me that we

15    have to start with what do we tell people.  And what I was struck

16    by is this:  The plaintiffs begin their response to our summary

17    judgment motion with these words --  Characterization is cheap so

18    I am going to read it.  They begin with, "Microsoft promoted one

19    feature of Vista above all others."  I started to do my

20    Mr. Tilden imitation.  I won't do that.  Read it in his voice.

21    "It promoted one feature of Vista above all others, the new

22    graphics comprising the elegant, new Aero user interface."  That

23    is the premise, we deceived people into thinking that was in Home

24    Basic.

25        I would ask your Honor to open the oral arguments exhibit to

1    tab 7.  That is the exhibit they cite for that.  This is not what

2    I am pulling out of thin air, this is the exhibit they cite,

3    declaration of Mark Tindall, docket 93, Exhibit D.  And your

4    Honor will see that is a check box.  And that the words "elegant

5    Windows Aero user interface", which they quote in their brief,

6    appear on a check box next to column labeled Home Basic, which

7    could not more plainly show that Home Basic doesn't have that

8    user interface.  It plainly shows that Home Premium does.  And

9    then above that plainly tells people, for a better experience

10   that come with the Premium editions, including the Windows Aero

11   user interface, ask for Windows Vista Premium ready PCs.

12       Your Honor, the fact is when we look at everything that is in

13   this record that Microsoft put out there, whether it was retailer

14   materials attached to Mr. Tindall's declaration, whether it was

15   his website, the get-ready website attached to the declaration,

16   whether it is the press releases that accompanied these programs,

17   every single one of them candidly, accurately stated, if you want

18   the new Aero user interface get Premium ready.  And, by the way,

19   your Honor, said, we want you to buy Premium ready; we recommend

20   it to you.  Completely counter to the plaintiffs' entire theory

21   of the case, that somehow we drove demand away from Premium ready

22   towards window Vista Capable but not Premium ready PCs.

23       And so what I am waiting for, your Honor, and have been

24   waiting for since the day that Mr. Tilden first held this

25   document up in the courtroom, when we first came here on the

1    motion to dismiss, is the piece of evidence where during the

2    class period Microsoft told class members that if you buy a

3    Windows Vista Capable PC you will get Aero.  To date we haven't

4    seen it.  And I don't think we will, your Honor, because the

5    desire was to drive people towards buying the Premium ready PCs.

6    That's where we will see the promotion directed.

7        All of the folderol about driving the market, increasing PC

8    sales, of course.  That was directed towards the effort to

9    increase awareness and recommend -- was directed towards Premium

10   ready PC, not the PCs of the class members.

11       I don't know if your Honor has any further questions.  I am

12   happy to stay up here as long as your Honor wants.  I realize I

13   have used my allotted 30 minutes.  Unless your Honor has

14   questions we would simply ask the Court decertify the class and

15   grant summary judgment.

16           THE COURT:  Thank you, Mr.  Rummage.  Mr. Tilden.

17           MR. TILDEN:  Good morning, your Honor.  I would like to

18   start everywhere as once.  And that won't work.  So let me recite

19   for the Court a handful of legal propositions we assert.  Then I

20   will talk some about the facts, and then we will talk more about

21   the law.  Unless the Court has anything you would like me to

22   address directly right now?

23           THE COURT:  Well, Mr. Tilden, I don't want to upset your

24   flow.  I mean, you have a lot of things to respond to but what

25   Mr. Rummage is telling me, and it is starting to make me nervous

1    here, is the really good suit the one-on-one for false

2    advertising.  Have we tried to pound that peg into the wrong

3    hole?

4          MR. TILDEN:  That is certainly their argument.  Let's

5    begin this way.

6          THE COURT:  Let me follow with Dr. Leffler.  I read his

7    materials and what is striking is that any professor teaching

8    economics 101 could write that report.

9          MR. TILDEN:  I think that is probably true.

10         THE COURT:  I don't want to use the wrong phrase.  I am

11   saying where is the beef, where is the analysis here that goes

12   from the general principles to the specifics, and what am I going

13   to tell the jury is the formula they use to give us the damages?

14         MR. TILDEN:  Surely.  Let me try and list some

15   propositions we believe and see if I can cover all of the Court's

16   questions there.  First, when you go through these cases, and we

17   will do it in more detail in a second, especially the antitrust

18   cases, you find they are, first, the results fact intensive as it

19   ought to be.  Second, most of those are expert/lawyer driven with

20   an expert economist theory, maybe assembled with a lawyer.  But

21   the expert is the key part of the case that gets presented at

22   trial.  That is not us.  The key part of our case that gets

23   presented in trial is admissions in Microsoft documents.  So we

24   are factually distinct from really all of those.

25       We are going to the jury, if permitted, with Jim Allchin's

1    testimony.  Dr. Leffler's expert testimony is far less critical

2    to our case than the average economist is in these circumstances.

3         Leffler says, look, given the fact there are 310 million

4    people in America, given the fact that it there are so many

5    computers, that computers are separated between laptops and PCs,

6    and this is where we were in the 2006/2007 time frame, if

7    Microsoft slash Intel wanted to dump 19.4 million 915 computers

8    on the market they could not have done it at the Vista Capable

9    price.

10        That argument is, A, confirmed by our class representatives.

11   B, it is confirmed by Microsoft's statements in the documents.

12   C, it is confirmed by other statements in the documents that an

13   expert can rely on.  D, it is extraordinary common sense.

14        We will take you through --  They spent some time with our

15   expert.  We will talk some about theirs.  We do not require,

16   given the factual record we have here, extraordinary expert

17   economist work.  Dr. Leffler says what Dr. Hitt says, their

18   Wharton economist, this cannot be done in any meaningful fashion.

19        I love the Canadian import litigation case.  We will get to

20   that.  It is entirely an expert concoction.  There may or may not

21   have been a tort there but their only evidence of it is the

22   expert report.

23        The court recites repeatedly that it is a novel theory.  It

24   is not clear a tort was committed at all.  It would doubtless

25   surprise, in a country or size as many vehicles on the road as we

1   have, a person in Corpus Christi that the car market in Duluth

2   had inflated the price of the car he bought by a dollar.

3       When I read the Canadian import case my first reaction is,

4   there is not a tort here, this shouldn't be a class, and it

5   shouldn't be a case.  We have got a different factual predicate.

6   So that's the big Leffler issue.

7       On a handful of legal of legal --  And Hitt agrees, if we

8   were here with a multiple regression analysis, which personally I

9   think would smack of voodoo economics, Mr. Rummage would be up

10  here with the voodoo economics cases saying, this cannot be done,

11  it is voodoo economics.

12      He purports to tell us in an alternative universe what a

13  given at Best Buy might have sold a computer for in March of 2006

14  in an advertising regime that didn't exist.  I have a lot of

15  sympathy for that argument Mr. Rummage would make but doesn't

16  have to.

17      So we and their economist agree with this principle, that you

18  can not meaningfully go back and quantify the average amount per

19  customer of damage.  In antitrust cases you must do it because

20  the antitrust damages must tie directly to the antitrust injury

21  in a way that Consumer Protection Act injuries need not.  And we

22  will talk about that in a second.

23      If the Court believes as part of a Consumer Protection Act

24  claim we have to show the average amount of price inflation --

25  price maintenance really.  They pass these off as Vista Capable.

1    Had they told the truth the price would have dropped.  If the

2    Court believes we have to show that delta, we can't do it.  I

3    want to be honest with you.

4        That is not our claim.  Our claim instead is that when they

5    dump 20 million of these on the market and call them a diamond

6    and not cubic zirconium, they were able to sell them at diamond

7    prices, and not whatever the other price would have been.

8        Let me show you a handful of documents.

9            THE COURT:  How are you going to get that number, the

10   difference between the diamond and the cubic zirconium?

11           MR. TILDEN:  We are not going to get that number.  We

12   have a handful of remedies instead that we propose.  One, none of

13   the argument we have heard from Mr. Rummage addresses the unjust

14   enrichment claim we have.

15       The best location of unjust enrichment class research is

16   Section 10.3 of Newberg on Class Actions.  Unjust enrichment is a

17   perfectly legitimate class remedy.  It is a clear way to identify

18   the class damages.  We have identified the damages.  They have

19   don't like the number.  In that event it would be a court issue

20   for the trier of fact, your Honor.

21       But we do not believe they have laid a glove on the unjust

22   enrichment class analysis.  We think the number is roughly

23   $1.5 billion for a class.  You can add it up.  While we have a

24   quarrel how large the class is, there is no quarrel what that

25   number is.  Now, they don't think it is the right number.  But

1    there is no dispute what the number is.

2          THE COURT:  How do you get that number, Mr. Tilden?

3    What do you put --

4          MR. TILDEN:  That is the total Microsoft income from the

5    sale of Vista Capable computers.

6          THE COURT:  Thank you.

7          MR. TILDEN:  Microsoft says, in fairness to them they

8    say, wait, wait, wait, the best case basis you are only entitled

9    to our profit and not the entire revenue.  I don't believe that

10   is what unjust enrichment law says.

11     As a friend of mine here says, when you get caught cheating

12   in high school and get and F you can't go in and argue, well,

13   look, I really would have gotten a B if you had let me take the

14   test, so I should only be dropped one letter and not five.

15     The question of what the exact unjust enrichment remedy is,

16   is one that is not teed up for today.  That is issue number one.

17   We don't believe they have laid a glove on the unjust enrichment

18   class, your Honor.

19     Issue number two.  We plainly have a class for nominal

20   damages and fees, although we don't have an interest in that.

21     Three.  The Consumer Protection Act remedy itself.  The

22   Consumer Protection Act allows the Court on these facts to award

23   either restitution or repair.  And I have handed up a notebook.

24   I would like to go to one of the inserts.  These are in the

25   left-hand side.  About five pages in, your Honor, I have a chart

1  that looks like this.

2      The very best case here, and the only one you absolutely need

3  to read, is the Allen case.  In 1981 it went to the Court of

4  Appeals.  The trial court awarded a restitution and rescission

5  remedy in a CPA case.

6      It went to the Court of Appeals, and the Court of Appeals

7  said, wait a minute, that is not actual damages under the

8  statute, and reversed.

9      It went up to the Supreme Court and nine to nothing, and in a

10  very direct discussion the Supreme Court reversed the trial

11  court.

12      We quote Allen two pages in at some length.  I don't need to

13  do it here.  But they leave no doubt that the restitution and

14  rescission --  In fact, there is a $250,000 trust fund the trial

15  court created there.  They leave no doubt in a unanimous opinion

16  that this is a fair remedy.

17      We collect on the handout five cases that stand for the

18  proposition that the causation of the CPA injury, while it is

19  plainly an element of liability in a Consumer Protection Act

20  case, that injury need not define the damages.  So once we show

21  that these people paid too much for their Vista Capable computers

22  we can establish damages with anything proximately caused by that

23  conduct.  It doesn't have to be the actual delta between what the

24  computers did sell for and what they would have sold for in some

25  alternative universe.

1    The repair costs, unjust enrichment are both reasonable

2    remedies, we believe, and they are both countenanced by these

3    cases.  They are both countenanced by the discussion in Newberg

4    at Unjust Enrichment at 10.3.

5         THE COURT:  You just said something, Mr. Tilden.  You

6    said "once we show that these people paid too much."  Where do

7    you get the "too much?"

8         MR. TILDEN:  A bunch of places, your Honor.  I have

9    collected -- we have collected in this --  This is the greatest

10   hits notebook for the Court.  In the left hand jacket are some

11   demonstratives like the ones we have looked at.  In the right

12   hand jacket in the back was a copy of the white paper, which was

13   an exhibit we discuss in our briefing.  In the core of the

14   notebook, which are the seven tabs, are key documents organized

15   by set.  The plaintiffs-paid-too-much documents are generally in

16   number seven.

17       When you look at those here are some things you find:  One,

18   Exhibit DD to my declaration are Sony documents.  "Without Vista

19   Capable messaging these computers will need to be discounted.  We

20   anticipate a financial impact in the three millions of dollars.

21   Calling these Vista Capable has reincarnated these end-of-life

22   computers."  Sony documents.

23       Keep in mind, when we subpoena these people we don't get a

24   lot of enthusiasm.  Microsoft is an important person in their

25   life.  I don't know what happens when they get our subpoena, but

1    they don't call us; they call somebody over here.  And I don't

2    know what they tell them but "give 'em everything you've got" is

3    not the message.  It is very hard to obtain this information.

4        That is what we have from Sony.  Office Max said, and this is

5    Exhibit Y to my declaration, "we cleaned out old inventory

6    without taking further discounts."

7        Document 25711.  This is MS-KELL.  "Comp USA and Circuit City

8    are telling OEMs that non Vista Capable computers will get marked

9    down.

10       Document 24864.  "XP computers", which is what these really

11   were, "were discounted after Vista released."

12       47095.  "Vista Basic is not moving.  Inventory rising.

13   Accounted for 15 percent of sales versus 47 percent we

14   predicted."

15       47095.  Again, Comp USA and Costco are talking of returning

16   the Basic SKU shop keeping unit.  Basic was responsible for

17   68 percent of the projected Vista forecast.

18       That is one.  We have documents in the record that tell us

19   that this happened.  Two, we know what Intel thought.  Intel was

20   banging the drum, screaming bloody murder, please allow these

21   non WDDM 915 chips to be called Vista Capable.

22       A man named Will Poole at Microsoft in late January of 2006

23   finally cracked.  This is tab 5 in the notebook.  I have given

24   them little tabs at the top.  Renee James is a big wig at Intel

25   who has been deposed.  Intel is in Santa Clara.  They are --  The

1   documentary record makes absolutely clear they are doing

2   cartwheels in Santa Clara once Microsoft relaxes the requirement.

3   "We are seriously confused.  We believe that 915 is not Vista

4   ready as it will never have WDDM drivers."

5       Let me footnote that if could, your Honor.  We filed a

6   summary judgment motion on this WDDM issue.  Microsoft disagrees

7   with the estimate.  We believe the class is 19 million, and 13

8   million of them are not WDDM computers.  They say the class is

9   smaller, and the class of WDDM computers is smaller.

10      But the WDDM computers can never be made Vista Capable.  You

11  have to throw out your computer and go buy a new one.  That is

12  our claim with respect to the WDDM issue.

13      James says, "we believe that 915 is not Vista ready as it

14  will never have WDDM drivers.  We believed your Vista ready

15  requirements doc said it had to be WDDM drivers to qualify for

16  the program sticker."  Which in fact it did.

17      If you turn a couple of pages further, three pages in, your

18  Honor, and highlighted --

19          THE COURT:  Three pages in on tab 5?

20          MR. TILDEN:  Yes, three pages past what we were reading.

21  It is the next page with the highlight.  Again, "so Intel's

22  exposure --"

23          THE COURT:  I will read off this one.

24          MR. TILDEN:  "So, Intel's exposure is $600 million."

25  Further down, "here is how their potential costs could get into

1  the billions."

2      We have ironclad evidence that Intel was looking at

3  significant write downs of the 915 chips in an amount of

4  billions.

5      Your Honor fingered one additional piece of evidence here.

6  The entire theory of Microsoft's defense here is that the

7  Microsoft marketing program adds no value, the calling something

8  Vista Capable did not make it more attractive.  Professor Hitt

9  argues, well, no doubt it makes it more attractive but the chip

10  market is infinitely elastic, and if more people want more

11  computers manufacturers will just create more computers at the

12  same price.  So increased advertising may increase the number of

13  computers sold but it will not affect the price at which they are

14  sold.

15      We know for a fact that is not true here.  Intel was fazing

16  out the 915 chip.  They were not going to ramp up production of

17  the 915 chip.  These are all the 915 chips that the world was

18  ever going to see.  What they wanted to do was pass these off as

19  Vista Capable and not as end-of-life chips.

20      I asked Professor Hitt directly on that issue.  To his credit

21  he stuck with his guns; if it is the case that calling something

22  Windows Vista Capable doesn't make it more valuable then the

23  reverse should be true too.  And he stuck with it.  This is

24  page 40 of his deposition.  I asked him first:  All right.  If

25  calling it Vista Capable doesn't make it more valuable would

1    calling it not Vista Capable make it less valuable?  This is

2    question number one at the bottom of 40.  And down here at

3    line 17 on 41 he says, no, it wouldn't make it less valuable.

4    That is obviously nonsense.  If you put it in the store and said

5    not Vista Capable the price would drop.  But he is tied into this

6    position by virtue of his claim that calling -- giving it an

7    attribute didn't raise the price.

8        We pushed him.  The next one.  What if you call it Won't Run

9    Aero, would you agree with me that would drop the price?  No.

10   The next page.  Won't run Glass.  Doesn't effect the price.

11   Number four, not what Jim Allchin demonstrated at WinHEC 2005?

12   Doesn't affect the price.  These machines weren't Vista Capable

13   for three years but we changed our mind last week and now they

14   are?  Wouldn't affect the price.  Next, these are Vista Capable

15   now but they won't be on February 2nd of 2007?  Won't effect the

16   price.  Technical requirements were recently lowered to make this

17   machine Vista Capable?  He starts to hedge.  He says, I don't

18   know.

19       Obviously all those things would affect the price.

20   Dr. Leffler says it would affect the price.  Everyone in the

21   courtroom knows it would affect the price.  Anyone sitting in

22   that box knows it affects the price.  And they have an expert

23   that says, no, it won't affect the price.

24       We have a boatload of concrete evidence in this case that

25   does not exist if the antitrust cases that I don't want to

1   unfairly tag, but involved claims that are expert economist

2   driven.  Our case is driven by the documents we have gotten from

3   Microsoft.

4       Let me, if I could, spend two minutes on the two cases that

5   Mr. Rummage addressed most directly, because I love them.  First

6   McLaughlin.  I am going to sound like someone that knows

7   something about either class actions or RICO but I am not.  I

8   think McLaughlin would come out the other way today.  I found

9   that out reading the In Re Grand Theft Auto class action case

10  they cited.

11      The Court observes this:  "McLaughlin went off on the need to

12  show individual reliance by every single person under the RICO

13  statute."  Something that your Honor held a year ago wouldn't be

14  happening here.  I didn't take strong issue with the ruling.  In

15  McLaughlin, unless it is RICO you have got to show individual

16  reliance.  If you can't do it, you lose.  Fair to me.

17      In 2008 in Bridge v. Phoenix Bond and Indemnity Company, 128

18  Supreme Court 2131, the US Supreme Court ruled that you do not

19  need to show individual reliance in a RICO case.

20      I think the McLaughlin decision would come down the other way

21  today.  I haven't looked to see what they are doing in the

22  McLaughlin case, but the central predicate of that decision has

23  evaporated.

24      Then we look at the In Re New Motor Vehicle case, which I was

25  fascinated by only because the notion that there was a tort there

1    seemed so farfetched to me.  They have got no evidence at all

2    beyond an economist report.

3        So compare that to us.  In both cases do we have an expert

4    opinion that the price was impacted?  You bet.  Look at all those

5    other things we have got that they don't have.  I won't read them

6    all.  Party admission that the goal of the marketing program was

7    to not stall sales.  E-mail by the marketing director that

8    nothing other than sales matters.  Retailers expressed fear of

9    markdowns without program.  Retailer inventory sold out.  It goes

10   on and on.

11       The Canadian import litigation is a lawsuit --  I note that

12   all that happened there was by a two to one vote they reversed

13   the certification of the class.  One judge believed that one

14   expert report was enough to go forward on the face of really no

15   facts whatsoever.  We are not the Canadian import case.  The

16   documentary evidence that has been assembled here is of a quality

17   that does not exist in any of the cases they have cited.  One.

18       Two.  The Consumer Protection Act here, and Allen is the very

19   best case, does not require that the damages proven be the

20   causation damages.

21       You see that most clearly actually in the pattern jury

22   instructions.  Injury is an element of liability, but that injury

23   is not the damages measure.  The pattern instruction on liability

24   I think is 310.01.  It lists the five elements in Hangman Ridge.

25   One of them is injury.  If you get past those five you get a

1  completely new instruction on damages.  Allen says --  It is wide

2  open territory.

3          THE COURT:  Including nominal.

4          MR. TILDEN:  Including nominal.  Although we don't have

5  any interest in that.  They use the example of Ms. Kelley paying

6  400 something dollars for her computer and getting $500 back, a

7  higher number.  I don't have any problem with that at all.

8      Let me make a couple of arguments to the Court here.  One, as

9  it happens, a wonderful argument for that kind of relief started

10  occurring -- we can take lawyer notice of the fact that the

11  Court, Mr. Rummage and I are all about the same age.  In the late

12  '70s, I think the statute was amended --

13          THE COURT:  I am sure I am older and wiser, Mr. Tilden.

14          MR. TILDEN:  Certainly wiser.  In the early '80s we were

15  trying cases over 2,400 bucks.  If you won or lost you put in

16  your fees for $4,100.  The loser would come in and say, how can I

17  owe $4,100 when the claim was only $2,400?  It would happen down

18  on the third floor of the King County Courthouse.  It happens all

19  the time.  The notion that the repair costs more than the widget

20  itself happens all the time.  Ms. Kelley was promised something

21  that was not delivered.  All we want is for her to get it.

22      How much more time do I have?

23          THE COURT:  Well --

24          MR. TILDEN:  I have used it up?

25          THE COURT:  Not quite, because I gave Mr. Rummage more

1    than he was due.  Why don't you spend another three minutes

2    making your point.  But I need to tell you I have somebody behind

3    the door waiting to plead this morning.

4         MR. TILDEN:  I am with you.  Let me make two points and

5    I will sit down.  I have said it before, the cases are fact

6    intensive and they are fact driven.  If you take the cases where

7    no class is certified, you find a set of rules that look better

8    for the defendants than they do for the plaintiff.  If you take

9    the cases where the class is certified you find a set of rules

10   that are frankly very flexible.

11       Two good examples, the two we like best --  I don't know how

12   to say the drug, but Caredizem -- the Caredizem CD litigation and

13   the Live Concert Tickets litigation.  The question on

14   decertification isn't who is going to win or lose on the merits,

15   it is given the claim what do we do here and what is the most

16   efficient thing to do.  These people will have, the class

17   members, no remedy at all if they can't proceed here.  We believe

18   the law permits a remedy here.

19       Microsoft is requiring a direct connection between the CPA

20   injury and the CPA damages.  The State of Washington doesn't

21   require that, and the Allen case rejected that 28 years ago nine

22   to zip.  Very directly.  It's only three paragraphs.  But they

23   leave no doubt that the Court of Appeals was reversed.

24       The second point I would make is this:  The unjust enrichment

25   class action remains unaffected by any argument they have raised.

1    We can show all the elements of unjust enrichment.  The damages

2    are class wide.  Newberg explains why.  That is an easy

3    proposition to handle.  There is no reason that we can see why it

4    is not the right remedy here or a correct remedy here.

5        The last point is this:  I was going to talk some about WDDM

6    today because it does highlight what is going on here.  This is

7    tab 6 in the Court's notebook.  "We have confirmed that 915 will

8    never be retrofitted with a WDDM driver, and therefore will never

9    qualify --"

10           THE COURT:  You have to slow down.  Is that the first --

11           MR. TILDEN:  I apologize, Judge.  It is the yellow

12    stick-em tab, at the very top of the pages.

13           THE COURT:  Got it.  Thank you.

14           MR. TILDEN:  "We have confirmed that the 915 will never

15    be retrofitted with a WDDM driver, and therefore will never

16    qualify for a Vista Logo."  This is in November of 2006.  In

17    November of 2006 915s were in the market being sold with Vista

18    Capable logos.

19        The e-mail talks about what happens on Vista release.  "On

20    Vista release these things will not be Vista but they are being

21    sold as Vista today.  The non WDDM computers in our class cannot

22    be upgraded at all unless by upgrade Microsoft means throw the

23    computer away and buy a new one."  If Ms. Kelley's remedy results

24    in that occurring we believe it is fair.

25        Here is the last one and I will sit down.  It is the yellow

1    tab 3.  Mr. Rummage ended by pointing out that he did not believe

2    any deception occurred; we have no evidence of deception at all;

3    the summary judgment should be granted.  Jim Allchin is a -- was,

4    he retired, a big wig at Microsoft.  Microsoft had a senior

5    leadership team, three people were on it, Gates, Ballmer and

6    Allchin.  He was the group vice-president for Windows, Home and

7    Business from '99 to 2005.  They changed his title, he kept the

8    same job.  He was way up at the top.

9        This is what Mr. Allchin said about the Vista Capable plan.

10            THE COURT:  Where are you reading now?

11            MR. TILDEN:  The yellow stick-em three.  "I believe we

12    are going to be --"

13            THE COURT:  Wait a second.  The yellow stick-em three

14    behind tab what?

15            MR. TILDEN:  Behind tab three too.  That is just a

16    coincidence.

17            THE COURT:  Go ahead.

18            MR. TILDEN:  "I'm sorry to say that I think this plan is

19    terrible and it will have to be changed."  It wasn't.  "I believe

20    we are going to be misleading customers with the Capable program.

21    OEMs will say a machine is Capable and customers will believe

22    that it will run all the core Vista features.  The fact that Aero

23    won't be there ever for many of these machines is misleading to

24    customers."  It is an admission.  It is directly from the top.

25    None of the antitrust cases contains a piece of evidence like

1    that one.  That is all I have.

2          THE COURT:  Mr. Rummage, I have to keep you short.

3          MR. RUMMAGE:  Two and a half minutes.

4          THE COURT:  Two.

5          MR. RUMMAGE:  You are a hard bargainer.  I don't have

6    any leverage though.

7        The first point, your Honor.  This is a theme that runs

8    through Mr. Tilden's presentation, this is a cubic zirconium that

9    they called a diamond.  Two things about that.  First of all, I

10   threw down the gauntlet and I said, show me what they told the

11   public during this time period that wasn't true.  Still silence

12   on that point.  Instead what we get is Mr. Allchin, the quotation

13   he just read to the Court.  And Mr. Tilden said, this plan is

14   terrible, it will have to be changed and it wasn't.  I invite the

15   Court to read the Totton declaration.  What Mr. Tilden said is

16   flat not true.

17       The plan was changed.  It was changed in particulars that

18   everyone in this Court knows about, most notably it introduced

19   the Premium ready concept which was then part of the marketing

20   program.

21       The important thing about this cubic zirconium/diamond thing

22   is to remember this:  This is the Windows Vista Capable program.

23   This is a program where everybody who participated in it bought

24   an XP PC, not a Windows Vista PC.  And your Honor knows from

25   reading the papers that the fraction of people who will ever move

1    off that XP PC, to whom these distinctions that Mr. Tilden speaks

2    so passionately about will ever matter, is minuscule.  Minuscule.

3    And yet this defective class action that Mr. Tilden wants to

4    proceed will award damages to every one, to the 90 plus percent

5    of people who never cared, who never would have upgraded, who

6    were exactly like Ms. Kelley, all on the say so of Dr. Leffler

7    that there was some increment of price inflation.  A nickel?  A

8    dime?  A buck?  I don't know.  But there was something in there.

9        Your Honor, we also have to remember this is about a class.

10   So their burden is not to show that somebody paid more.  Their

11   burden to get a class certified is to show that they have a way

12   of proving that everybody paid more.

13       When Mr. Tilden says to your Honor everybody in this

14   courtroom knows that 19.4 million of these non WDDM compliant PCs

15   dumped on the market is going to decrease the price.  I don't

16   know that.  I certainly don't know that it is going to affect the

17   price of a particular PC in Tallahassee or Corpus Christi, the

18   city that Mr. Tilden referred to, or Charleston or anywhere else

19   sold at a Best Buy where the Best Buy marketing strategy is to

20   perhaps drive people to Premium ready PCs.  None of us know that,

21   because the plaintiffs didn't bother to give your Honor any hint

22   of a way to find it out.

23       And finally, your Honor, with respect to the cases, one

24   important point is that the McLaughlin case that Mr. Tilden said

25   would go differently today.  He misses the point.  There are two

1    separate discussions in McLaughlin, one about reliance, one about

2    lost causation.  We don't rely on the discussion about reliance

3    because we always knew your Honor had ruled that was not an

4    element under the CPA.  We rely on the discussion about lost

5    causation, which is as good today as it was then.

6        And Allen, your Honor, is a case that does not involve people

7    asking for harm to be proven -- or I shouldn't say harm, injury

8    to be proven through one type of harm and damages proven through

9    another.  In that case, Allen, what happened is the plaintiffs

10   proved that they were induced to buy worthless hand.  And so the

11   question is do they get, quote, damages, or do they get, quote,

12   restitution.  Both of them relating to the same harm, that is the

13   worthless land that they bought.

14       Here the plaintiffs say, we were harmed because we paid an

15   extra nickel, dime, whatever, we don't know what, and whether or

16   not we were ever going to upgrade to Windows Vista, whether or

17   not we were ever going to change our PCs from XP, whether or not

18   our computer does everything we wanted.  Just like Ms. Kelley

19   said, my computer, t is not a cubic zirconium, it does everything

20   I bought it to do, but I want a $500 check anyway so I can buy a

21   new PC.

22       And then finally, your Honor, unjust enrichment.  Your Honor

23   correctly noted in the class certification order that the measure

24   of unjust enrichment was whether Microsoft had earned increased

25   or sustained income as a result of this.  In other words, your

 1    Honor was not looking for the number that was the same number we

 2    would have earned even without the alleged deception.  And

 3    Dr. Leffler, to his credit, said, I can't compute that number.

 4    Nobody knows that number.  And so the number that Mr. Tilden is

 5    advocating is simple math.  It is every nickel that everybody in

 6    the class paid for an XP license, people who are today sitting at

 7    their computers using that XP operating system.  And, again,

 8    harkening back to the first point I made, the vast majority of

 9    whom never had any intention -- over 90 percent never had any

10    intention of upgrading to Windows Vista.

11        So, your Honor, this is a meat hook that the plaintiffs are

12    trying to use in cases that should be dealt with by a scalpel, if

13    at all.  This is a situation where the plaintiffs have --

14    Mr. Tilden said, this is not an expert driven case.  This is a

15    cases that is driven entirely by experts and lawyers who have

16    dreamt up an issue that would not have been dreamt up by any user

17    of these PCs, who got what they wanted, got what they paid for

18    and are using it today.

19        So we would ask the Court to grant summary judgment and

20    decertify the class.  Thank you, your Honor.

21            THE COURT:  Thank you, counsel, for your arguments.  I

22    will write you an opinion about this.  You will not see it for at

23    least two and a half weeks.  So not next week, not the week

24    after, you will see it the following week.  And I do know that

25    have you other stuff teed up for me.

1        Anything else that I can help you with today?

2             MR. RUMMAGE:  No, your Honor.

3             MR. TILDEN:  Nothing here, your Honor.

4             THE COURT:  If I could get everyone to move their things

5    quickly, I have another hearing that I have kept waiting.

6                       (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **CERTIFICATE**

2

3

4

5

6

7

8
           I, Barry L. Fanning, Official Court Reporter, do hereby
9     certify that the foregoing transcript is true and correct.

10

11                              S/Barry L. Fanning

12                              _____

13                              Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25